Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

WILLIAMS INVESTMENT CO., INC., a corporation, and A. Duncan Williams, Individually and as President of Williams Investment Co., Inc., Defendants.

Civ. A. No. C-73-133.

United States District Court, W. D. Tennessee, W. D.

Jan. 24, 1975.

Marvin M. Tincher and Thos. L. Rasnic, U. S. Dept. of Labor, Nashville, Tenn., for plaintiff.

Edward G. Grogan, Heiskell, Donelson, Adams, Williams & Wall, Memphis, Tenn., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McRAE, District Judge.

This matter having come on for trial before the Court, sitting without a jury, and the Court having considered the testimony, exhibits, pleadings, the proposed findings of fact and conclusions of law, and the complete record, hereby makes the following findings of fact and conclusions of law.

This action was instituted by the Secretary of Labor, United States Department of Labor, under section 17 of the Fair Labor Standards Act, hereinafter referred to as the Act, alleging that the defendants violated the provisions of sections 6, 7, 11(c), 15(a)(2) and 15(a)(5) of the Act and seeking judgment permanently enjoining and restraining defendants from violating the provisions of said sections, including the restraint of withholding of payment of any unpaid minimum wages and overtime compensation due employees of defendants under the Act.

The plaintiff is Peter J. Brennan, Secretary of Labor, United States Department of Labor, who is duly empowered to administer and enforce said Act.

The defendant Williams Investment Company, Inc., hereinafter called "Com-

pany," is a corporation engaged in the business of managing real estate property owned by it and by A. Duncan Williams, hereinafter called Williams, individually. The management of this property includes, among other things, rental of the property, maintenance, collection of rent and handling complaints.

All of the stock of the Company is owned by A. Duncan Williams, Inc., a Tennessee corporation. All the stock of A. Duncan Williams, Inc. is owned by the defendant, Williams.

Williams is president of the Company. As the President of said corporation, he has and exercises the authority to hire, fire, set wages, hours and other incidents of employment with regard to employees of the Company.

The disputed issues in this case pertain to 18 resident managers or resident agents at various apartment complexes who were employees of the Company during the period covered in this case. The defendants first deny that there is coverage as to the resident managers, primarily on the theory that they are the ultimate consumers of goods referred to in the Act. 29 U.S.C. § 203(i). Secondly the defendants alternately deny that there has been proof of violations entitling the plaintiff to injunctive relief, including the restraint of withholding unpaid minimum wages and overtime compensation.

It is stipulated that the Company has had an annual gross volume of sales made or business done which has not been and is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated).

At all times since March 6, 1971, two or more maintenance personnel employed by the Company regularly painted some apartments, cleaned pools (in season), repaired garbage disposals, air conditioners and other appliances (not under warranty), replaced glass in windows, light bulbs and other fixtures, sowed grass seed, fertilized lawns, and otherwise handled and worked on goods which were manufactured outside the State of Tennessee, shipped into Tennessee and purchased by the Company in Tennessee and elsewhere from various suppliers and used at all the apartment complexes owned and managed by the Company.

At all times since March 6, 1971, the Company has had two or more office personnel regularly receiving correspondence, telephone messages, checks, invoices and other materials from outside the State of Tennessee, and regularly preparing and sending correspondence, checks, telephone messages and other materials to points outside the State of Tennessee.

Among the duties of the resident managers or agents were included minor maintenance matters on some occasions; for example, checking air conditioning filters, or replacing light bulbs. The resident managers or agents sometimes cut or watered the lawn and placed chemicals in the swimming pools.

At all times material hereto, defendant Company constitutes and has constituted an enterprise within the meaning of sections 3(r) and 3(s)(1) of the Act, in that it has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling or otherwise working on goods that have been moved in or produced for commerce by other persons, and whose annual gross volume of sales made or business done has not been and is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated). 29 U.S.C. § 203(r), (s)(1).

■■ Defendants were not the "ultimate consumers" of products shipped into the State of Tennessee and purchased by defendants in Tennessee. Such products were "goods" within the meaning of section 3(i) of the Act. Brennan v. Dillion, 483 F.2d 1334 (C.A. 10, 1973).

Having determined that there was enterprise coverage, the Court must resolve the difficult issues of what violations are established by the proof and what relief should be granted. On these

issues the proof is sometimes complex, contradictory, and vague.

The defendant Williams was primarily in the municipal bond business from 1969; however, he also sought to acquire apartment complexes in the Memphis, Tennessee area. This was done in his name or in the name of the Company. At various times in the early nineteen seventies Williams or the Company acquired complexes referred to as Macon Manor I, Macon Manor II, Kingsbury, Willow Creek, East Hill, Rangeline, Cadraca Woods, and Raleigh Woods.

The various complexes involved in this case differed in several respects which affected the duties of the resident managers. First the size of the complex was a factor. The number of apartment units has a bearing on how a resident manager will function. Additionally, some complexes were acquired as completed units already rented, whereas some of them were acquired as new construction and the resident managers began working before all construction was completed. The proof also reflects that in some complexes the resident managers worked from their own apartments, which were standard apartments. Other managers had apartments equipped with a small office off the living room. Other complexes had offices, in which the resident managers or agents worked, that were in the complex but not in or adjacent to the apartments occupied by the managers. In this situation there was usually a model apartment to be shown to prospective tenants.

The proof establishes that the primary job of resident managers or agents was to rent apartments; this included seeing that there was a display apartment clean for showing tenants, receiving inquiries by telephone from prospects, showing the apartments, and doing some paper work in connection with the rental. Although the established complexes had a turnover of tenants, there was more time and work required to place tenants in recently opened complexes.

An additional significant duty of the resident managers pertained to receiving complaints from tenants, usually with regard to maintenance problems. This also included a duty to assist in solving complaints. However, there was a strict prohibition against giving the owner's name and phone number. In fact, the resident managers were instructed to tell the tenants who threatened to call the owner (Williams) that if the tenant did call, "it is a guarantee the complaint will never be worked." See Trial Exhibit 21, "Resident Manager Guidelines," issued over the signature of A. Duncan Williams, December 8, 1972.

The proof establishes that the Company had maintenance personnel whose duty it was to contact the resident managers and receive complaints and then remedy them. This included servicing the lawn. However, the resident managers frequently undertook to remedy minor complaints in the absence of the maintenance personnel. The defendant Williams expected the resident managers to explain to some tenants that the management was not responsible for all problems. See Trial Exhibit 21, "Resident Manager Guidelines."

There is a wide variety of proof from the different former resident managers concerning what their duties and efforts consisted of with regard to complaints and maintenance. Some watered the lawn. Others removed tacks from waste disposal units, checked air conditioning filters, or replaced light bulbs. Some of the managers even offered some tenants a haven from an irate or drunken spouse.

The plaintiff Secretary of Labor offered as part of his proof the testimony of 16 females who had served as resident managers or agents for the defendants during the period covered by this case. The Compliance Officer assigned to this case has made computations based on the version of the proof asserted by the plaintiff as the hours worked by the respective managers. This forms the basis of the plaintiff's contention

that this Court should order the defendants to pay these former employees the respective amounts which total $24,675.-22.

It is the further contention of the plaintiff that the time records which were kept for parts of the time and for certain ones of the employees should be disregarded because they were based upon erroneous interpretations of the law and illegal instructions from the administrative personnel of the Company and the defendant Williams.

The defendants have asserted that resident managers are entitled to pay only for the time actually spent performing services for the defendants, i.e., answering the telephone pertaining to business or showing apartments.

In March 1971 Compliance Officer Moore conducted a wage and hour investigation of the defendants. Prior to this investigation no payroll records were kept on resident managers. A future compliance discussion was had. Thereafter an ineffective and inaccurate system of payroll records was adopted whereby the resident managers were to keep their own records, and the maintenance supervisors were to pick them up. However, this was not done for all managers.

The record reflects that Viola Breeden kept records from March 19, 1971, through February 4, 1972. Mrs. Breeden was a resident manager at Macon Manor I and II and at Kingsbury. She also served as one who trained and supervised other resident managers. The records kept by Mrs. Breeden reflect that she worked a different number of hours each day, usually in the morning and usually 4 or 5 hours. The totals vary but they are in the 20 to 26 hours per week category. She testified to the contrary at the trial. However, she was unable to be precise. Her testimony was approximate and based upon averages. The records were not available, and

therefore she was not questioned about them.[1] She testified that she worked eight or ten hours per day for six days, based upon her recollection, but this was qualified by such words as "around" and "can't be sure."

In December 1972 Compliance Officer Moore made a second investigation. Because there were no records furnished him, he interviewed in excess of twenty employees and former employees. The second investigation prompted instructions, bulletins, and renewed efforts with regard to the payroll records of the resident managers. However, the plaintiff contends that these records should also be disregarded.

The proof does establish that oral instructions were given to contrive the records. Furthermore, they are incomplete in that none are available for some of the former employees. This Court also finds that the failure to keep proper records was known by the defendant Williams as well as his subordinates.

An example of the records after the December 1972 investigation of Compliance Officer Moore is Trial Exhibit 13. These are time records of Diane Birdsong from April 8, 1973, through January 13, 1974, which is practically the entire time that she was the manager. She was manager of a 40-unit complex and used her own apartment to show rental prospects. She testified that she normally began work at 9:00 A.M. and averaged eight hours per day, seven days per week. The time records kept by her are daily sheets with a weekly summary. The records are not totaled. However, for the most part the daily records show under one hour for items such as telephone calls, cleaning, letting telephone repairmen in, etc. The weekly totals vary. Some are under two hours, most of them are under 10 hours per week. Although there are no itemized explanations on the daily sheets, during the week of September 18, 1973, through

---

1. These records are Trial Exhibit 24. They were introduced at the end of the trial with the explanation from counsel that they had been found with some records at the defendant Williams' bond business location.

September 25, 1973, Mrs. Birdsong entered eight hours each day for a total of 56 hours per week. For the next week she reverted to her former method and had a total of 10 hours and 40 minutes for the week. This method continued until she left the employ of the defendants.

On cross examination it was brought out that for part of the time she kept other people's children as well as her own, and for several months cared for five children while she was working as resident manager.

Another problem pertains to the disparity and vagueness of the proof concerning the compensation paid to the various managers. Basically the managers were given their apartments rent free. In some instances the rental value changed up or down during the period of employment. During the latter part of the period covered by the lawsuit the more prevalent practice was to establish a salary and then deduct the value of the apartment. In addition to the apartment, some managers were furnished utilities; however, for the most part the proof concerning how much the utilities cost was not known or it was approximated. Additionally, some managers were furnished the telephone or an additional telephone. This created an issue in the proof, pertaining to how many times a manager used the telephone for personal calls as opposed to business calls in the case of some managers who were furnished telephones by the defendant Company. Furthermore, the record reflects that at least some of the agents were also paid a commission for each apartment they leased.

Having determined that there is coverage for resident managers, this Court also concludes that there was clearly a violation of 29 U.S.C. 211(c) which requires the keeping of proper records, and that an injunction should issue requiring keeping records in the manner hereinafter set forth.

It is upon the issue of a right to a restraint of "withholding minimum wages or overtime compensation found by the Court to be due the employees" that this Court must now explain its reasoning and conclusions more particularly.

In Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687–688, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946), the Supreme Court set forth the evidentiary rule in an employees' suit brought under the Act, wherein the employer's records are inaccurate or inadequate. The Court noted that the "employee has carried out his burden if he proves he has in fact performed work for which he was improperly compensated and if he produces sufficient proof to show the amount and extent of that work as a matter of just and reasonable inference." In such a case damages may be awarded even though approximate.

Based upon the proof offered, a troublesome issue exists as to when the managers were working, in as much as their work stations were in their own living quarters or in close proximity thereto. There is proof to reflect that the defendant Williams expected them to be available for telephone calls from prospects at all times during working hours. On the other hand there is also proof that the system was devised to permit the managers to call the office when they would be away from their telephones.

In 1944 the Supreme Court ruled upon two cases which involved the time that fireguards spent on the employer's premises waiting, subject to call as firefighter. Armour & Co. v. Wantock, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944); Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

In the *Skidmore* case the Court said:

We have not attempted to, and we cannot, lay down a legal formula to resolve cases so varied in their facts as are the many situations in which employment involves waiting time. Whether in a concrete case such time falls within or without the Act is a question of fact to be resolved by appropriate findings of the trial court.

Walling v. Jacksonville Paper Co., 317 U.S. 564, 572 [, 63 S.Ct. 332, 87 L.Ed. 460]. This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances. Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged. His compensation may cover both waiting and task, or only performance of the task itself. Living quarters may in some situations be furnished as a facility of the task and in another as a part of its compensation. Ibid. at pages 136–137, 65 S.Ct. at page 163.

Pilkenton v. Appalachian Regional Hospitals, Inc., 336 F.Supp. 334 (W.D. Va., 1971) is a case in which the Court held that hospital employees who lived in apartments leased by the employee were not working during the time they were on standby in their apartments or could be reached by telephone and could be at the hospital within twenty minutes. In that case the Court relied heavily upon the benefit test set forth in the *Armour* case, namely, whether the "time is spent predominantly for the employer's benefit or for the employee's . . . dependent upon all the circumstances of the case." 323 U.S. at 133, 65 S.Ct. at 168.

■ In the circumstances shown by the proof in this case this Court concludes that the waiting time spent by resident managers in their own apartments was not compensable for minimum wages or overtime under the Act. Of course the time actually spent in the apartment upon the employer's business in the form of answering or making telephone calls and otherwise, is compensable and covered. Any time during which the manager is required to remain in an office or model apartment in the complex to await calls in person or on the telephone is covered.

■ The Court must now consider whether the proof establishes that the resident managers are entitled to additional compensation for work actually done. This Court concludes they are not, because the proof does not show "the amount and extent of the work actually performed as a matter of just and reasonable inference" as required by Anderson v. Mt. Clemens Pottery Co., *supra.*

This does not mean that this Court approves of or condones the conduct of the defendant Williams, which was established by the proof, namely, that he arbitrarily minimized the time and efforts of the resident managers and that he violated the record keeping provisions of the Act. However, the Court must note that the testimony as to time actually worked was based upon indefinite estimates. As the trier of fact this Court finds that for the most part these estimates lack the reliability which could form the basis of damages even under the approximate method approved in Anderson v. Mt. Clemens Pottery Co., *supra.* The testimony of some of the former managers is impeached by the records which they kept themselves as opposed to an employer not having kept the records. The testimony of some of the former managers is also impeached by items brought out in cross examination.

In addition to the proof on hours worked being vague and indefinite, the proof as to the amount of the compensation of the managers is variable in many instances. The value of utilities is not known or it was approximated; some managers received commissions for rentals in addition to their quarters or fixed salary, and the value of apartments changed during the employment in some instances.

In summary this Court concludes that resident managers of the defendants are persons covered by the Act and that an injunction should issue requiring the keeping of records. The application for an injunction restraining the defendants

from withholding the payment of unpaid minimum wages from March 7, 1971, to the date of the hearing is denied.

The injunction against the defendants shall require the Company and Williams to cause to be kept all payroll records required by the Act and regulations adopted pursuant thereto. Additionally, the defendants are enjoined to notify in writing all resident managers and agents of their apartment complexes that their services are compensable under the Act and that payroll records reflecting the time actually worked and the rate of compensation must be kept. Said managers and agents shall also be notified where they shall be available for calls in person or by telephone, and for what hours, and at what other times and circumstances they shall be authorized to act in behalf of the defendants. This notice shall be given to all existing managers and agents and to all future managers and agents at the time of hiring.

The defendants are also enjoined to indicate upon the payroll records of the managers and agents the cost or assigned value of all items furnished to the managers and agents, such as apartment rental and utilities, including telephones. The defendants are further enjoined from compensating resident managers and agents upon the basis of a particular number of hours per day or week to cover all services performed in behalf of the defendants, for example, two hours per day for all telephone calls.

Nothing herein or in a separate injunction prepared in accordance herewith shall prevent any existing or future manager or agent from filing suit to recover unpaid compensation for violations of the Act from and after the date of the hearing.

Counsel for the plaintiff is hereby directed to prepare and submit to the Court a decree consistent with the terms hereof.